You may proceed. Thank you, Your Honors. May it please the Court. My name is Aliyah Karmali on behalf of Petitioner Santa, Jeronimo De Ramos, and her daughter, Daylen. The main issue in this case is whether or not the agency, the Board of Immigration Appeals, properly found that Petitioner was not a credible witness, and whether or not that was supported by substantial evidence. The lower courts here erred in according Petitioner's Declaration and Testimony 08 without substantial evidence to sustain an adverse credibility finding. Well, okay, so let's walk through it because, I mean, we get these all the time. I struggle with these because sometimes it does feel a little bit like a technicality or whatever, but, I mean, our law says if there's, our precedent says if there's any evidence that supports that then we have to, you know, generally affirm that because that would satisfy substantial evidence. So, the BIA and the IJ found discrepancies in Ramos' description of her fluency in Spanish. That is the predominant issue, yes, Your Honor, and it is substantial evidence. It's not any evidence. And it's also that it's not, I mean, we have abandoned the notion that just one is good enough, right? So, it has to be some substantial contradictions, if you're relying on contradictions. Exactly, Your Honor, and I think here there was clear error because, as we've stated in our brief, there were seven or eight instances in which Petitioner testified over and over again to the judge, you know, this is how I learned Spanish. I learned Spanish by watching television in my neighbor's house. This was for eight years off and on. She watched Spanish language programming. I mean, but the IJ weighs all of this. I mean, she claimed not to have a significant facility in Spanish, but the IJ pointed out, you know, one of the things in the record is a two-hour psychological interview that was done in the Spanish language. So, there were, I mean, you have explanations for that, but the IJ gets to weigh this and took a different view of it, and don't we have to give deference to that? Well, you don't actually have to give deference anymore to the BIA's agency decision under Loper-Bright, Your Honor. Well, no, that's not true. I mean, in fact, Loper-Bright doesn't touch this at all because this is not a legal determination that Loper-Bright might address. This is exactly within the IJ's purview, which is a factual determination of a witness's credibility. I mean, going back to what Judge Collins was saying about the psychological evaluation, that actually militates in favor of Petitioner if she was able to speak in Spanish for that amount of time. I think what we're concerned with is there were a number of instances When she was here, after she got here. That's correct. And she said that after she got here, her Spanish improved. That's correct. It was two years, I believe, Your Honor, after she arrived in the United States. So, it's sort of, it's either irrelevant or substantiated her testimony as to her, as to the fact that she learned her Spanish mostly after she got here. But there is, she did testify that while she was at home, she understood fairly complicated sentences. Yes, Your Honor. Yeah, many of the programs that she launched dealt with really intense topics such as detention, arrest, death, murder. I mean, these are all very common issues, unfortunately, in Guatemala. Of course, some of the other things she launched were very innocuous and banal, you know, shampoo commercials, hygiene commercials. But I think... To me, a larger question is why would she lie about this if she, in fact, did understand Spanish well? She could have just said so and it wouldn't have changed anything about her story. Right. And I think that's what we were shocked by as well, Your Honor, that this decision... Well, and I understand that, but you have to agree that whether we agree with it or not, the statute clearly says it doesn't have to be relevant, that inconsistencies or adverse credibility findings don't have to go to the heart of the matter, correct? Not about whether or not this is a material, you know, issue, Your Honor. What we're seeing is that, you know, the I.J. largely substantiated his findings on the fact that he didn't consider her reasonable explanations. It's also the circuit precedent that omissions, you know, are not enough to substantiate credibility, adverse credibility findings under the Substantial Evidence Act. One factor the I.J. noted is, you know, the theory of danger, the credibility that that was the motivation is undercut by the fact that she left two of the children behind. Well, she has an explanation for that, Your Honor. But he doesn't have to accept that explanation. I mean, at some point he gets to weigh the testimony, and under Mingdi v. Garland, you know, we have to give that deference, and the standard is if it has to be that every reasonable adjudicator would be compelled to accept the explanation. Do you meet that high standard? Petitioner's position, yes, Your Honor, is that there is a number of pieces of evidence, expert, you know, information, amended declarations, amended applications that were not considered at the lower level, and had they been considered. And the country reports basically weren't considered at all, and they're quite extensive. That's true as well, Your Honor. But as to the question that Judge Collins asked, she, the person, the child she took with her was the daughter, right? That's correct, Your Honor. There were two sons. Yes. Her claimed social group quite substantiated by the country conditions was women or indigenous women. That's correct, Your Honor. So it certainly makes sense that she was more concerned about the girls than the boys. Yes, Your Honor. You know, going back to the administrative record, as I was saying, I mean, the petitioner did testify that she comprehended Spanish. She watched Spanish for eight years, I believe. Her husband also testified to that. Well, her husband testified that she knew a word or two, which is inconsistent with what she said. So I don't know how much that matters or whether the IJ perhaps could just rely on that, although we didn't believe anything else he said, so I'm not sure why he could believe that. What's really concerning here as well, Your Honor, is that the IJ posits a number of false dichotomies over and over and over again between implausibility, that, you know, petitioner doesn't understand Spanish, she couldn't possibly have understood any words that her persecutors said to her in Spanish, and malingering, you know, that she lied about not knowing Spanish, testifying that she knew only a little. So this is a false binary that's unnecessary and reaches illegal error because both things could possibly be true. You know, it's very possible and plausible that petitioner, in her eight years of watching Spanish television, could understand the Spanish word for woman, that she could understand the Spanish word for indigenous, that she could understand the Spanish word for rape, and those were the three things that she overheard that were communicated to her on at least two separate instances. But unfortunately, the IJ doesn't address any of these issues. Do you want to talk about some of the mistakes? I mean, there were clear factual mistakes that the IJ and the BIA made. Yeah, I mean, with respect to petitioner's gender, she did testify that she overheard her assailant saying, you know, that they wanted to harm her because she was an indigenous woman, and she did testify to that. That's at Carr 176, but the judge drew an adverse credibility inference here because the statement was not included in her declaration. If this decision stands, anybody who adds additional detail at their merits hearing could potentially be found not credible simply because they're having... Well, but we already have precedent that says just that. I mean, that is a consideration that the IJ can take into account, is whether information was presented at the first possible time or whether it came in after the fact. So I'm not sure. I mean, I understand your position, which is it's not fair in this circumstance, but that's really no different than we hear in hundreds of others of these cases. And I mean, if we go down your road, our work's going to come to a screeching halt because we're never going to be able to rely on anything that the IJ says. We're always going to have to do an independent analysis. And that's not how this is going to work. I think, Your Honor, I mean, in our situation, Petitioner was not saying, I forgot that this happened to me. Let me add that. She wasn't adding instances of harm. She wasn't adding very material information. These were, you know, very minute details that any petitioner should be allowed to add on their testimony because it augments their claim. It actually goes to corroborates consistent testimony. But you would agree that if there were some very relevant information that went to the heart of the matter and it were not in the initial application and then it were brought up later, at a minimum, the IJ would be within the right to question, wait, why didn't you say that initially? Are you coming up with a post hoc record? We're not disagreeing with that. Then why doesn't that answer this question? Well, the IJ, that's not what's at issue in this case. We're not talking about whether or not these omissions were material or not. We're talking about whether or not the substantial evidence in the record supports an adverse credibility finding. And there's numerous things that the IJ misstated, as Judge Bearsden was saying, and frankly didn't include whether it comes to country conditions. The expert report, our psychological expert report said over and over that, you know, Petitioner was evaluated in a manner that was consistent with other survivors. She was evaluated forensically. The evaluator noted that she had a scar on her leg from one of the instances in which she was attacked. This was barely mentioned if at all in the IJ report, in the IJ decision, nor in the BIA's decision, and that's very concerning to Petitioner. I mean, the other issue is whether or not the agency's, you know, decision to discredit the testimony of Petitioner's non-testimony, testimonial evidence, witnesses was supported by substantial evidence. And here the IJ repeatedly says that there's a number of implausibilities in Petitioner's record, predominantly looking at the auxiliary reports, because Petitioner did report multiple instances to the auxiliary authorities. And again, the IJ focuses on whether or not those individuals spoke Spanish or spoke an indigenous language. It frankly seems to be a red herring in this case. It's plausible that you can have a native language and speak a secondary language. It's very common for people throughout the world, and in Guatemala specifically, 40% of the population is indigenous, but they live in a Spanish-speaking dominated society and culture. So it's completely plausible that they speak possibly more than two languages even, considering there are multiple dialects of different indigenous languages in Guatemala. The IJ then turns his decision to the husband and concerns himself with the fact that Petitioner's husband wasn't present in Guatemala to witness the harm. However, this isn't required under the Real ID Act, nor under the FRE. Well, more than the husband, the other witnesses they said didn't see it, but they heard it and they were there right afterwards and they completely discounted them, even though they were obviously corroborating witnesses who had knowledge of the circumstances. That's correct, Your Honor. Petitioner's father, I believe, heard her screaming when individuals attempted to drag her into the trees outside their home and rape her. So while he didn't see them physically doing that, he did hear her screams and that is why he came to her aid. So, I mean, those are, you know, here's the 003 present sense impression. There's multiple other exceptions that we argue in our brief, but the IJ doesn't touch on this whatsoever and simply discredits the husband's testimony and letters of support because he wasn't an eyewitness and that doesn't comport with the Real ID Act. With respect to Petitioner's children, there was another issue as to whether or not her child, Brandon, heard one of their land. And the IJ misconstrues this issue because Petitioner testified that she heard the assailant call out to Brandon. She never said his name. She never said it was his name. Right, that's correct. Could have said little boy or who knows what. Right. Or you or whatever. Right, so again, this is not an inconsistency. This shouldn't go to credibility, but it does become the focus of the IJ's decision. You know, overall, in looking at the auxiliary letters again, the IJ says that they're not authenticated and therefore, you know, offers diminished weight to them simply because they're not notarized, even though they are signed. And in the Ninth Circuit, the Mueller failure to authenticate documents under Shire does not constitute sufficient evidence for an adverse credibility finding. There's a number of... Do you want to reserve any time, Counsel? Yes, five minutes, Your Honor. Oh, for rebuttal? Or two minutes. I think you've got one minute left. Okay. The other issue of concern to Petitioner is the analysis in the IJ's decision with respect to disfavored group. He seems to hang his hat on the analysis that Petitioner should meet a higher burden under the individual. The problem is that if the credibility finding stands, then she was not singled out and the disfavored group issue isn't going to apply, right? Those are two separate analyses, Your Honor. Well, it's separate, but you still need some singling out, and if you don't believe what she said at all, then where's the singling out? Well, the country conditions establish that there's a pattern in practice of... That's different. Pattern of practice is different. Right. And so, if there's a pattern in practice that's been established, then there's a lesser need for an individualized showing, which is Main Circuit precedent. Well, then there's no need if it's a pattern of practice. Essentially, yes. And the IJ flipped that analysis, Your Honor. Well, as I understand it, the BIA never addressed the pattern of practice question at all. The IJ... Right. I'm sorry. The BIA did adopt the IJ's analysis and focused specifically on an individualized... I thought they just never addressed it at all. Yes. I mean, never addressed it, even by adopting the IJ's as to the pattern of practice. That's correct, Your Honor. And the country conditions show, I mean, over and over again that there was a civil war that raged in Guatemala from 1960 until 1996 and that the bulk of the victims of state violence were indigenous. I believe it's approximately 83% of the victims. That legacy continues to this day. We can give you one minute for rebuttal. Okay. Thank you. Good morning. It may please the Court. Jennifer Williams for the respondent. The agency denied petitioner's applications based on the numerous material inconsistencies and omissions between her testimony, her husband's testimony, and other documentary evidence in the record. What was there other than the Spanish issue and maybe the money? Other than that, there were no documented inconsistencies, I don't think. Well, there were a number, and I can list them as found by the IJ and affirmed by the Board. There was her ability to speak Spanish, inconsistencies as to whether the auxiliaries had policing powers. Well, that wasn't inconsistent. I mean, he said that she said that all they did was organize events, but that's definitely not what she said. That's what she said in the record. That's not what she said. She said that they basically were kind of a neighborhood patrol. She said they didn't have authority to arrest except if there were no orders. And she said they organized events as something else they did, but she didn't say that's what they did. And it clearly wasn't what they did. Everybody was calling them for a reason, not to organize events. Well, but that is the inconsistency in the record. The immigration judge says, so what they did was to organize events, and she said yes. Yes, among other things. But the record doesn't indicate that she said among other things. Before that one sentence, she said several times that they did other things. And that's just not held up by the record. Which goes to a bigger point. In order to make out an asylum claim, she has to show that the authorities were unable or unwilling to help her. A theme throughout her testimony is that the Guatemalan police were unable or unwilling to help because she is indigenous. And so she went to the auxiliaries. Which is completely substantiated by several of the country conditions reports. That rural indigenous people have very little access to police. Well, but she can't have it both ways. She also relies on the auxiliary reports which use the word authority as evidence that they did. They did assist. I mean, either they had policing power. So either there was no inconsistency. If there was no inconsistency, it's because she testified. She had the authority to figure out who the person was and then go to the authorities to get authority to arrest them. Or to get someone else to arrest them. But all she said was that they can't arrest people without orders. But the fact still is that three of the people, we could discuss whether they were eyewitnesses or not. The government's position is that they were not. Tell me about that. If somebody is standing right nearby and hears her screaming and comes and sees her hysterical and sees somebody running around, that's not an eyewitness? Well, they never saw the attackers. I think that's clear from the record. They came after the fact. They may have heard, but they never saw the attackers, which is another element of an asylum claim. It's not corroborating that they heard her screaming and they came and saw her at what we would call an in hearsay, there's a phrase for an immediate reaction. And therefore should there be discounted entirely? Well, one thing that doesn't corroborate is who the attackers were, that they were Ladinos and non-Indigenous Spanish speaking men. Okay, that's one thing that doesn't corroborate, but it corroborates that somebody attacked her, that she was very upset and that they couldn't find them. It corroborates that much. And there were three different people like that. But one thing she has to show, and it's a central element of her asylum claim, is that she was attacked. But that's not the point. The point is that they just didn't give them any credence about anything. No, the immigration judge, the agency made an adverse credibility finding and then properly and separately looked at whether the documentary evidence in the record was sufficient. No, I don't believe that's what the immigration judge said. The immigration judge said it wasn't sufficient. And part of the reason those letters from the witnesses in particular were not sufficient is that they don't corroborate the requisite nexus element. They don't corroborate who the attackers were, that they were Ladinos. The immigration judge went through all of the documentary evidence in the record and specified why, in his opinion, they weren't sufficient. But I think in this case, the burden of proof is important and the standard of review. It's petitioner who bears the burden. And the standard of review is the evidence has to compel the conclusion. I think we're disagreeing about... Just a minute. These documents from the witnesses were relevant for at least two reasons, right? One of them is to corroborate her credibility and the other is separately, if she's already declared not credible, to determine whether there's separate evidence by itself. But for the first purpose, certainly these people were pertinent and should have been paid attention to rather than written out. But many of the inconsistencies involved the question of nexus and they involved the question of whether the Guatemalan police or the auxiliaries were unable or unwilling to protect her. Those are two central elements of her asylum claim and a lot of the inconsistencies, like her ability to speak Spanish, like the policing powers of the auxiliaries, go to those required elements. And so while... I mean, under the REAL ID Act, the inconsistencies do not have to go to a central element of the claim. In this case, a lot of them do. Some of them are more peripheral. But at least the major ones go to central elements of her asylum claim. And I wanted to address... The BIA... Did the BIA address at all the pattern or practice issue? We believe it did. It did not say pattern and practice, but it's cited to the pages of the immigration judge's decision that talked about pattern or practice. Is there a legal distinction between a disfavored group analysis and a pattern and practice analysis? Are those different or are those two ways of discussing the same thing? No, they're different. For the disfavored group analysis, the applicant still has to show some individualized risk of harm. And pattern and practice, they don't have to show any individualized risk of harm. But the burden to show the pattern or practice is much greater than showing a disfavored group. So, and our position here is that... I mean, the IJ addressed both. The board used the words disfavored group, but specifically cited to the section of the IJ's decision discussing pattern and practice. Can you show me where that is in the BIA opinion? And we cite the pages in our brief that the board... the pages of the IJ's decision that the board cited to discussing pattern or practice. But what's clear is that the agency, looking at the two decisions as a whole, it did consider the country conditions report. It recognized a history of discriminatory behavior against indigenous people in Guatemala, but it also recognized that they have some representation now in the government. And it found that the evidence did not compel the conclusion. Can I ask... In response to where it is at the BIA, is this at page 5 of the BIA decision? It says, we affirm the IJ's denial of protection under CAT. We acknowledge reports of human rights abuses in Guatemala. However, in the absence of credible testimony or independent corroboration by the respondent's claim, this generalized evidence is insufficient to demonstrate the respondent's eligibility for CAT protection. Is that the same thing, or is it somewhere else? It's somewhere else, because that's not...  Well, as we discussed in our brief, so we say to page 7 of the administrative record, the board says it affirmed the IJ's denial of asylum and withholding under the INA, but it referenced pages 85 to 87 of the IJ's decision in which the IJ found no pattern or practice of persecution. And then it expressly acknowledged the reports in the record of discrimination and harm against indigenous individuals in Guatemala. And then after that, that was a quote. The board again specifically referenced the pages of the IJ's decision discussing the country conditions evidence in the context of his no pattern or practice finding. Again, this was... So the administrative record at 6 is the board's decision, and it references... But she had claimed... She was claiming specific particular social groups, most notably women in Guatemala and indigenous women in Guatemala. And I hope you've read the reports, but I did read them, and they are replete and repetitive on the notion that women are the subject of... Now, not just in the past, the subject of serious violence in Guatemala and that rural indigenous women in particular have essentially no access to protection, even though the government is, in other respects, trying to correct the situation, but not in a way that is helpful to rural indigenous women. And what we have about all of that, which goes on for many pages and 7 or 8 different reports, we acknowledge reports of human rights abuses in Guatemala, period. Well, in the context... I assume we're talking in the context of a pattern or practice claim where the only evidence she can rely on is the country conditions. Or as corroborating her own evidence. I mean, if you read these reports and you read what she said, they're pretty closely aligned. Yes, but if we're talking about anything where she has to show an individualized risk of persecution, and we accept her testimony that the auxiliaries do have some policing power, that their job is not just to organize events in the town, then the record evidence shows that in her case, they did respond. The auxiliaries responded and they did some police-like things. They at least looked around. And at page 4 of the BIA decision, I guess this may be the corollary to what I read before. Maybe this is more analogous. However, it does recognize, as Judge Berzon noted, the record of discrimination and harm against indigenous individuals in Guatemala. However, such generalized reports do not show that the respondent experienced past persecution or that she has a particularized risk of future persecution. That's basically what the BIA said. We can look at these generalized reports, but just because the country conditions report says these are the conditions, that doesn't mean that every person who fits within that is subject to facing it. They still have a duty to come forward with some evidence that they've been facing that. They do, and that's the analysis that applies. Which comes back to the adverse credibility finding. Yes. The only claim for which she wouldn't have to show any individualized risk of persecution is a pattern or practice claim, but that's a much higher burden. I'm still trying to find where the pattern or practice is addressed. Well, our position is that the board addresses it because the agency addresses it. The IJ specifically discusses pattern or practice at pages, I think it's now 85 to 87 of the administrative record. And the board does not say pattern or practice, but it talks about the country conditions evidence in the record. So basically the stuff I'm reading is shoehorning in the pattern or practice. Yes, and the specific site to the pages of the IJ's decision that does talk about pattern or practice. And there's lots of case law that the board... After saying that, they're discussing disfavored group. I mean, the board specifically says... Well, but the standard is even... As we say in our brief, the standard for pattern or practice is even higher than disfavored group, and so... Yes, but their reason for finding that she wasn't eligible for a disfavored group is that she had no individualized proof. And for pattern or practice, you don't need individualized proof, so they never address that. Well, but they also do... The board specifically... I mean, the IJ does, but the board also specifically discusses the country conditions evidence and says, while it shows discrimination, it doesn't show persecution. And we think it's a fair reading of that, that it encompasses... What the IJ says, and this is at ER 86, page 13 of the IJ's report, says this respondent did not testify to credibility. So again, we've got the credibility threshold we have to overcome. She's not established past persecution or that she has a special role within the indigenous community likely to come to the attention of any potential persecutors. I mean, is that... I'm still looking for the pattern or practice. Well, excuse me. I mean, this seems to be a different analysis, which is she doesn't have an individualized role that would bring her into that risk. Oh, here we go. Essentially, the court would liken her burden to needing to show a pattern and practice of persecution to the indigenous community. The respondent has not established this. That's what you're relying on. Right. Yeah. Okay. But again, the only claim for which she doesn't have to show any individualized risk for which the adverse credibility determination would not be relevant is pattern or practice. For every other claim, it is relevant. It's supported by substantial evidence in the record. And the documentary evidence is not sufficient to independently sustain her burden of proof. I see my time has expired. Thank you. You've got one minute for rebuttal. Your Honors, I do want to note with respect to pattern and practice that the husband whose declaration was admitted, although given diminished weight, did corroborate the fact that there were individuals outside their home on at least one occasion that attempted to harm respondent because of her race and her gender. Similarly, the auxiliary letters were admitted. Even though they were given diminished weight, they do also corroborate that respondent was potentially almost raped on at least two occasions. That goes to gender. And with respect to the issue of whether or not petitioner testified that the auxiliary authorities do anything other than organize events, she says, and this is at car 169, the auxiliary mayor helps a bit with any problems. Not like the police, but they don't have the power to punish, unlike the police who are Ladino and speak Spanish. So she doesn't just say that they organize events. She does say that they help with other problems. These are civil authorities. These are not criminal authorities. The two can be true, that they organize events and they attempt to resolve disputes in the town apart from the police. Okay. Thank you so much. Thank you to both parties for your arguments in the case. The case is now submitted.
judges: BERZON, NELSON, COLLINS